# Illinois Official Reports

## Appellate Court

---

### *People v. Cowart*, 2015 IL App (1st) 113085

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES COWART, Defendant-Appellant. |
| | |
| District & No. | First District, First Division<br>Docket No. 1-11-3085 |
| | |
| Filed | February 9, 2015 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for first-degree murder under a theory of accountability and being an armed habitual criminal, the appellate court reversed the murder conviction on the grounds that the State failed to establish beyond reasonable doubt that there was a common criminal design between defendant and the armed partygoers who participated in the shooting melee that resulted in the victim's death, and with respect to defendant's conviction for being an armed habitual criminal, defendant's 2002 conviction for aggravated unlawful use of a weapon was held unconstitutional in violation of the second amendment right to bear arms and the State could not rely on this now-void conviction to serve as a predicate offense for being an armed habitual criminal. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-13763; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| | |
| Judgment | Reversed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Christopher L. Gehrke, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1     Following a jury trial in the circuit court of Cook County, defendant Charles Cowart was convicted of first-degree murder under a theory of accountability. Following a simultaneous bench trial outside the presence of the jury, the defendant was also convicted of being an armed habitual criminal. Subsequently, the trial court sentenced him to 51 years of imprisonment for first-degree murder and a concurrent 20-year sentence for the armed habitual criminal conviction. On direct appeal, the defendant argues that: (1) the State failed to establish beyond a reasonable doubt that he committed first-degree murder under a theory of accountability; (2) the State failed to prove beyond a reasonable doubt that he was an armed habitual criminal; and (3) the trial court erred in imposing a 20-year firearm enhancement sentence on his first-degree murder conviction. For the following reasons, we reverse the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3     On June 21, 2009, in the late evening, victim Lee Floyd (Lee) was shot and killed at an outdoor party located at West Van Buren Street and South Keeler Avenue in Chicago, Illinois. On June 26, 2009, police officers arrested the defendant, who was subsequently charged with the first-degree murder of Lee, the offense of being an armed habitual criminal, and aggravated discharge of a firearm. The defendant asserted in his videotaped statement to the police that one of his friends, Keevo,[1] accidentally shot Lee during the party. Prior to trial, on June 20, 2011, the State decided to proceed with the first-degree murder and armed habitual criminal charges, but nol-prossed the remaining charges.

¶ 4     On June 21, 2011, a jury trial commenced. Tytianna Johnson (Tytianna) testified on behalf of the State that, at about 10:30 p.m. on June 21, 2009, she, Iesha Parker (Iesha), Keyana

---

[1]The spelling of this individual's name varies in the record as "Keevo" or "Kevo."

Williams (Keyana), and Elaina Riley (Elaina) attended a Father's Day outdoor celebration in the area of West Van Buren Street and South Keeler Avenue in Chicago. Tytianna estimated that about 200 people attended the party, including Jasmine Benson (Jasmine) and the defendant, whose nickname was "LC." Tytianna noticed a group of "boys standing around" with the defendant, including an individual nicknamed "Bird," which she described as the "LC crew." Tytianna noticed that the defendant had a gun tucked into his waistband, that he wore a white tee shirt bearing a photograph of someone, and that the "[m]ajority of the whole party" wore the same shirt. Although Tytianna testified at trial that she did not see Bird with a gun, she had previously informed the grand jury and an assistant State's Attorney that Bird had a gun at the party. At some point, Jasmine and Ashley Dockery (Ashley) got into a verbal argument, while Tytianna and Ashley's boyfriend, Tommy, stood nearby. About 7 to 10 minutes later, "a whole crowd of boys" stood in front of Tytianna, Iesha, Keyana, and Elaina. The group of about 20 boys included the defendant, Bird, "Smooth," and the victim, Lee. Elaina then made a statement, which caused the "whole party" to get "real rowdy" and to turn against the girls. Smooth then threw a drink in Iesha's face and the defendant slapped Iesha. Elaina then hit the defendant, who then hit Elaina and she fell to the ground. The crowd then started "going crazy" and everyone was "swinging." Ralph Benson (Ralph), who was the father of Tytianna's children, then physically pulled Tytianna out of the fight. Moments later, Tytianna heard gunshots and observed "Pooh Bear" shooting a gun in the air. Tytianna and Ralph then hid under a parked truck on the corner of the street. During the incident, Tytianna heard a total of about 25 to 30 gunshots fired from four or five different guns and heard the boys yell, "[s]hoot them ho's, [s]hoot them ho's." Several days later, on June 27, 2009, Tytianna cooperated with the police and identified photographs of the males she saw at the party, including Pooh Bear, Tommy, Bird, and she also identified the defendant in a physical lineup. On cross-examination, Tytianna was impeached with her grand jury testimony, which stated that "[m]ost of the males" she saw at the party had guns in their possession.

¶ 5    Iesha testified that at about 10 p.m. on June 21, 2009, she, Tytianna, Keyana, and Elaina attended an outdoor party in the playground of an elementary school at West Van Buren Street and South Keeler Avenue. Iesha estimated about 50 to 100 people in attendance, and partygoers stood on the sidewalks, yard, and streets. Iesha saw Tommy, Pooh Bear, Keevo, Melissa Meridy (Melissa), and Jasmine at the party. Jasmine engaged in an altercation with Ashley, after which Tommy walked to Jasmine and Melissa on the street corner, said something to them, and walked back toward the elementary school grounds. Elaina then said something to Pooh Bear, which caused "all the guys out there" to walk toward the girls who were on the street corner at West Van Buren Street and South Keeler Avenue at that time. Iesha knew that something was about to happen and started to leave when Smooth or Suavo threw a drink in her face. The defendant then struck Iesha in the face, after which Elaina and the defendant engaged in a physical altercation. Iesha described the scene as "[e]veryone just got fighting." When gunshots rang out, Iesha fled southbound on South Keeler Avenue toward a bridge leading to Harrison Street. As she fled, she continued to hear about six or seven gunshots, looked back and saw Elaina fall down, and saw the defendant shooting over the bridge at them from the corner of the elementary school. After she reached Harrison Street, Iesha hid under a porch for about 20 minutes. On June 27, 2009, Detective Garcia came to Iesha's home and brought her to the police station, where she identified photographs of Keevo,

Bird, Suavo, Tommy, and Pooh Bear. Iesha also identified the defendant in a physical lineup and in a statement to an assistant State's Attorney as the person who had shot at her.

¶ 6    Peggy Allen (Peggy) testified that she lived in a first-floor apartment near the intersection of West Van Buren Street and South Keeler Avenue at 4158 West Congress Parkway. In the early morning of June 22, 2009, Peggy awoke to the sounds of gunshots close to her apartment. She looked out the window onto South Keeler Avenue and observed two girls running southbound toward West Congress Parkway and ducking between cars as a young man followed and shot at them. A group of people also followed behind the shooter as the shooter followed the girls. The gunman shot at the girls at least six times–three times before Peggy looked out the window and three times as she watched the incident unfold. After the shooting, Peggy discovered bullet holes in her windows, the dining room, and the kitchen. The next day, Peggy spoke with the police and showed them the damage to her home. Police officers recovered bullets and photographed the damage caused by the gunfire to her residence.

¶ 7    Melissa testified that at about 8 p.m. on June 21, 2009, she and Jasmine attended the barbecue party in an elementary school yard in the area of West Van Buren Street and South Keeler Avenue. The defendant, who wore a tee shirt with a picture on it, was at the party. At some point during the party, Melissa, who was standing in the middle of the street on West Van Buren Street, saw a fight on the corner of West Van Buren Street and South Keeler Avenue. Melissa observed Suavo hit Elaina. Tytianna's boyfriend then picked Tytianna up off the ground at the corner of West Van Buren Street and South Keeler Avenue. As the fight broke out, Melissa telephoned a friend. After the telephone call, Melissa approached the corner where the fight was occurring and heard about nine gunshots. However, she did not see who was firing the shots. Melissa ducked behind cars as she fled and headed home. On June 28, 2009, Melissa went to the police station and identified the defendant, Pooh Bear, Keevo, Tommy and Suavo in a photographic array as individuals who were present at the party. Melissa also informed the police that she had observed Pee Wee flashing a gun before the fight occurred at the party.

¶ 8    Roceaser Ivy (Roceaser) testified that he met the defendant in 2006 and that he came into contact with the defendant again in 2008. At trial, Roceaser initially denied that he was ever in the area of West Van Buren Street and South Keeler Avenue on the evening of June 21, 2009 or the early morning hours of June 22, 2009. He denied witnessing the defendant's involvement in a shooting at that location. Although Roceaser was impeached at trial with his prior statements to the police, the assistant State's Attorney, and the grand jury, in which he said that he had observed the defendant shooting a gun on the night of the party, Roceaser testified at trial that he had lied to the authorities and the grand jury because the police had threatened to take his parole away.[2]

¶ 9    Assistant State's Attorney George Canellis (ASA Canellis) testified that on July 2, 2009, he met with Roceaser, who informed ASA Canellis of the details of the shooting. ASA Canellis testified as to Roceaser's testimony before the grand jury, which was published to the jury at trial: In his grand jury testimony, Roceaser testified that, after midnight on June 22, 2009, he was walking down South Keeler Avenue near West Van Buren Street and was trying to buy marijuana. Roceaser estimated that there were about 300 to 400 people outside

_____

[2]At the time of trial, Roceaser was in federal custody on an unrelated drug charge and had previously been convicted of other felony offenses.

"celebrating something." As he walked on South Keeler Avenue toward West Van Buren Street, Roceaser saw the defendant fire a gun and saw "fire jump from his hand." When the shooting began, Roceaser was walking on the east side of South Keeler Avenue and was two sidewalk "squares" from West Van Buren Street, while the defendant was standing diagonally across the street next to an elementary school on the southwest corner of the intersection. A crowd of people stood behind the defendant. Roceaser informed the grand jury that he had no difficulty observing the defendant at the time of the shooting because lighting from the school building shone on the defendant. The defendant was wearing a white tee shirt, blue jeans, white tennis shoes, and a white hat. Roceaser's grand jury testimony stated that he heard no gunshots prior to the defendant's firing the gun; that the defendant had extended his arm and was shooting at somebody rather than up in the air; and that Roceaser initially heard at least five or six shots and fled toward public transportation at West Van Buren Street and Pulaski Road. Roceaser could still hear gunshots as he fled, which became quieter as he got farther away. In his grand jury testimony, Roceaser also stated that he was treated fairly by the police; that the police did not make any threats or promises to him in exchange for his statement; and that ASA Canellis never made any promises to him regarding his parole status.

¶ 10    At the time of trial, the State called former Assistant State's Attorney Jenni Scheck (Scheck) who testified that on July 1, 2009, she and Detective Garcia met with Roceaser and had a conversation with him about the details of the shooting, which was then memorialized in a typewritten statement. At some point during the conversation, Scheck questioned Roceaser alone in the police interview room, and Roceaser never indicated that either Detective Garcia or other police officers threatened to revoke his parole unless he agreed to speak with them. Scheck testified that Roceaser was given the opportunity to make changes and corrections to the statement and that he attested to the accuracy of the statement by signing the bottom of each page. During Scheck's trial testimony, the typewritten statement was admitted into evidence and published before the jury. The typewritten statement of Roceaser stated that after midnight on June 22, 2009, he was looking to buy some marijuana in the area of South Keeler Avenue and West Van Buren Street. As Roceaser headed southbound on South Keeler Avenue near West Van Buren Street, he saw the defendant standing across the street near a school at the southwest corner of the intersection. The defendant, who was wearing white tennis shoes, blue jeans, a white tee shirt and baseball hat, stood under a light emanating from the school building. Roceaser stated that the defendant was "with some other people but seemed to be a step ahead of the group." There were also "groups of 15 to 20 people and a bigger group behind the school." Roceaser then observed the defendant with a gun in his hand and heard two gunshots. Roceaser saw "fire" come out of the defendant's hand as he discharged his weapon "in the direction where other people [were] standing." Roceaser stated that the defendant "definitely shot the gun towards people and not up into the air," that he did not hear any gunshots before the defendant fired the gun, and that Roceaser then fled upon seeing the defendant shoot his gun. After he started running, Roceaser heard other gunshots, which grew fainter as he got farther away. Roceaser also stated in the typewritten statement that he was treated well by the detectives and Scheck; that he was given food by the police; that he was allowed to use the restroom whenever he needed to; that he was not handcuffed at any time at the police station; and that no threats or promises had been made to coerce him to make a statement; that he gave the statement freely and voluntarily; that he was allowed to make any

- 5 -

changes or corrections to his statement; that he put his initials by the changes or corrections that were made; and that everything contained in the statement was true and accurate.

¶ 11 Officer Kevin Ebersole (Officer Ebersole) testified that at 12:30 a.m. on June 26, 2009, several days after the shooting, he and his partner, Officer Suing, were on routine patrol when they received a radio flash message of a vehicle and occupant who had been involved in an incident at Lake Street and Homan Avenue. About a minute later, as the officers headed southbound on Homan Avenue, Officer Ebersole spotted the vehicle matching the description in the flash message. Once the police stopped the vehicle, the front passenger exited the vehicle with a "nickel or chrome-plated" handgun in his hand and thereafter placed the gun into his waistband. At trial, Officer Ebersole identified the defendant as the individual he observed exiting the vehicle. Officer Ebersole testified that the defendant exited the vehicle and fled westbound on Ohio Street and into an alley near Trumbull Avenue. During the pursuit, Officer Ebersole observed the defendant throw the handgun onto the roof of a garage near 512 North Trumbull Avenue. Moments later, Officer Ebersole apprehended the defendant. Other police officers then recovered the handgun from the roof of the garage where the defendant had tossed it.

¶ 12 Officer Nick Beckman (Officer Beckman) testified that on June 26, 2009, he arrived at the 500 block of North Trumbull Avenue and spoke with police officers who were already at the location. He was directed by other officers to the roof of a garage at 512 North Trumbull Avenue, where he recovered a 9-millimeter semiautomatic handgun with a chrome finish. The handgun's magazine was empty and Officer Beckman inventoried the weapon. Evidence was presented by the State at trial that subsequent testing of the handgun showed that it matched three cartridge cases that were recovered from the June 21, 2009 shooting crime scene near 407 South Keeler Avenue.

¶ 13 Detective Gregory Jones (Detective Jones) testified that he investigated the shooting death of Lee. On June 26, 2009, Detective Jones interviewed Roceaser, who identified the defendant in a physical lineup as the person who had fired a handgun during the shooting melee on June 21, 2009. On June 27, 2009, Detective Jones also interviewed Iesha, Tytianna, and Keyana. Tytianna identified the defendant in a physical lineup as a person she saw "involved in a fight just prior to the shooting and also a person she saw with a handgun in his waistband before the shooting." Tytianna also identified Tommy and Pooh Bear in a photographic array. Iesha viewed the physical lineup separately and also identified the defendant as "the person who had punched her in her face with his fists and then fired multiple shots at her as she ran." Iesha further identified Bird, Pooh Bear, Tommy, and Suavo in a photographic array. On June 28, 2009, Detective Jones also interviewed Melissa, who identified Pee Wee, Suavo, Tommy, Keevo, Pooh Bear, Bird, Elaina, Iesha, Lee, Roceaser, Smooth, Fish, Lil One, Chris Rock (Rock), D-Mac, and the defendant in a photographic array. Melissa informed Detective Jones that she had seen Pee Wee with a gun prior to the fight and that Tommy had made threats to shoot anybody who "touches his girl." On June 29, 2009, Detective Jones and his partner also interviewed Ashley, who identified Lee, Melo, Rock, Tommy, Keevo, Pooh Bear, Smooth, Pee Wee, and the defendant as being present at the party at the intersection of West Van Buren Street and South Keeler Avenue on June 22, 2009. However, Ashley was not present at the time of the shooting. On July 1, 2009, Detective Jones reinterviewed Roceaser. Detective Jones testified that Roceaser was not placed under arrest or in handcuffs; that no threats were made to him regarding his parole status; that an assistant State's Attorney memorialized a

statement made by Roceaser; and that Roceaser testified before the grand jury on July 2, 2009. Detective Jones testified that, in the course of his investigation, he had evidence that "there were multiple people shooting" at the street corner of West Van Buren Street and South Keeler Avenue. On July 6, 2009, Detective Jones conducted another physical lineup with Iesha and Tytianna, from which Iesha identified Tavaris Hightie (Tavaris) as "being at the scene with a gun" and Tytianna identified Tavaris as "one of the people actually shooting a gun." During Detective Jones' testimony at trial, the defendant's videotaped statement to the police was published to the jury.

¶ 14    In his videotaped statement, the defendant stated that he helped organize the Father's Day celebration for one of his "homies," Boodro, who died eight years earlier. The defendant and many partygoers wore tee shirts with Boodro's picture on the front. The party included food, drinks, a D.J., and a photographer, and was located in a schoolyard at West Van Buren Street and South Keeler Avenue. The party was going smoothly until some "females" started to get into a fight with each other, and Bird tried to resolve the dispute by telling a female individual to "get the [expletive] on." The defendant described what unfolded next. The defendant stated that he slapped the female at the corner of West Van Buren Street and South Keeler Avenue because she was "talking crazy." According to the defendant, the "baby daddy" of the woman he had slapped then "hit [the defendant's] homie, Smooth." The defendant did not know the identity of the "baby daddy." The defendant stated that when the "baby daddy" hit Smooth, the defendant and all of his friends, including Smooth, Marvin, Lee (the victim), Keevo, and Big Greek surrounded the man. The defendant stated that when they had "baby daddy" surrounded in a circle, Keevo said, "watch out, I'm [fittin'] to kill this bitch." The defendant then heard the first gunshot, and saw people move back. At that time, Keevo was facing West Van Buren Street and South Keeler Avenue, while the victim, Lee, had his back turned toward that intersection and was facing West Congress Parkway and South Keeler Avenue instead. When the second gunshot sounded, the defendant claimed that he saw Lee "roll over on the ground," but the defendant did not know at the time that Lee had been shot. The defendant claimed that Keevo accidentally shot Lee when Keevo was trying to "get this bitch." When a third gunshot sounded, the defendant heard "all the bullets *** going towards the bridge" near West Congress Parkway, in the direction where "two girls" were running as the shooting began. When asked who was shooting, the defendant answered, "Kevo shot first. [Pooh] Bear shot. Pee Wee shot. *** I had my gun out[,] Bird had his gun out." However, the defendant denied that either he or Bird fired their weapons, but stated that "I had a nine. Bird had a nine. Basically it was a lot of nine's out there it was a few .357 [revolvers]." The defendant noted that he had been shot on multiple occasions in the past and, thus, took his gun out once the shooting began. The defendant stated that "baby daddy" was able to escape by running away. He noted that "baby daddy" got away because, once gunshots were heard, "everyone out there wasn't focused." The defendant denied walking with the crowd that followed and shot at the girls who were running toward the bridge. Instead, he claimed that he, Bird, Smooth, and Pee Wee put Lee into Smooth's car, and Smooth drove Lee to the hospital. The defendant claims that he ran to Gladys Avenue to get away from West Van Buren Street and South Keeler Avenue because the police were coming and he still had the gun in his possession. The defendant then gave the gun to someone named "Melva." He did not find out that his "homie" Lee had died until the following morning. The defendant claimed that the handgun that the

police recovered from his person several days after the shooting was a different firearm than the one he had in his possession during the shooting.

¶ 15    At trial, after the defendant's videotaped statement was played for the jury, Detective Jones testified on cross-examination that, based on his interviews with the witnesses, Lee was standing on the street near the southwest corner of the intersection of West Van Buren Street and South Keeler Avenue when he was shot. Detective Jones estimated that, at the time Lee was shot, there were "several people" directly around him and "a couple hundred people" at the party, and there were several handguns that had been fired at the time Lee was shot. On redirect, Detective Jones testified that the police had not recovered any firearms other than the gun that was recovered from the defendant.

¶ 16    Evidence was presented at trial that the police found shell casings and blood at the crime scene. Evidence technicians located and recovered 26 shell casings, a fired bullet, and a bullet jacket from the crime scene, which led Tonia Brubaker (Brubaker), a forensic scientist, to conclude that at least 28 gunshots from six or seven different firearms had been fired at the scene–including two .38-caliber firearms; four 9-millimeter firearms; and one unknown firearm. Stephen Balcerzak (Balcerzak), an evidence technician, also testified that revolvers do not expel shell casings and, thus, would not leave such evidence behind.

¶ 17    The State, outside the presence of the jury, also introduced into evidence two certified copies of the defendant's previous convictions: the first was a certified copy of a January 9, 2007 felony conviction for possession of a controlled substance with intent to deliver, in violation of section 401(d)(i) of the Illinois Controlled Substances Act (Act) (720 ILCS 570/401(d)(i) (West 2006)) (case No. 06 CR 2687101); the second was a certified copy of a February 1, 2002 felony conviction for aggravated unlawful use of a weapon, in violation of section 24-1.6(a)(1) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/24-1.6(a)(1) (West 2002)) (case No. 01 CR 1233801).

¶ 18    By stipulation, the parties agreed that Dr. Tera Jones (Dr. Jones) performed the autopsy of Lee's body. Dr. Jones observed a gunshot entrance wound on his right upper back and the exit wound on his right upper chest. The bullet traveled from "back to front slightly right to left and upward." Examination of the skin around the entrance wound revealed no evidence of close-range firing, which typically occurs when the firearm is less than 18 inches from the victim. The parties stipulated that Dr. Jones would testify within a reasonable degree of medical and scientific certainty that the cause of death was due to a gunshot wound on Lee's back and the manner of death was homicide.

¶ 19    After the State rested, three witnesses testified on behalf of the defendant. Antonio Williams (Antonio) is the defendant's nephew and was about 14 years old at the time of the shooting. Rekia Williams (Rekia) is Antonio's mother. Tiana Cowart (Tiana) is the defendant's wife. Antonio, Rekia and Tiana testified that they saw the defendant fighting with some women when they heard the first gunshots at the Father's Day party. Antonio testified that once the fight broke out, "everybody started fighting." Antonio testified that, before the shots were fired, Lee was standing on the sidewalk by the entrance door of the elementary school, which was about 15 feet away from the corner of West Van Buren Street and South Keeler Avenue. Antonio did not see Lee get struck by a bullet, but only saw him fall to the ground. All three witnesses testified that they neither saw the defendant in possession of a gun nor fire a weapon and that they fled the scene shortly after they heard the gunshots. Rekia and

Tiana also testified that the defendant wore a sling on one of his arms on the night of the shooting.

¶ 20    During jury deliberations and outside the presence of the jury, the trial court conducted a simultaneous bench trial and found the defendant guilty of being an armed habitual criminal. Following deliberations, the jury found the defendant guilty of first-degree murder of Lee and found that he personally discharged a firearm.

¶ 21    On September 23, 2011, the trial court denied the defendant's motion for a new trial. The trial court then sentenced the defendant to 51 years of imprisonment, which included a 20-year firearm enhancement, and the court imposed a concurrent 20-year sentence for the armed habitual criminal conviction. On September 30, 2011, the trial court denied the defendant's motion to reconsider the sentence. The defendant then filed a timely notice of appeal. Accordingly, we have jurisdiction.

¶ 22                                    ANALYSIS

¶ 23    We determine the following issues on appeal: (1) whether the State established beyond a reasonable doubt that the defendant committed first-degree murder under a theory of accountability; (2) whether the State established beyond a reasonable doubt that the defendant was an armed habitual criminal; and (3) whether the trial court erred in imposing a 20-year firearm enhancement sentence on the defendant's first-degree murder conviction.

¶ 24    We first determine whether the State established beyond a reasonable doubt that the defendant committed first-degree murder on a theory of accountability.

¶ 25    As a preliminary matter, the defendant points out in his reply brief that the State's response brief makes various references to gang evidence, which had not been presented at trial, and asks that this court strike or ignore these gang-related references. We agree that the State's original brief makes gang-related references from portions of the transcript of the defendant's videotaped statement that were not played for the jury. However, in December 2014, this court granted the State leave to file a corrected brief, which removed from the brief all gang-related references that were not admitted at trial. The corrected brief did not make any substantive changes to the State's arguments regarding the issues on appeal. Also, in the interest of judicial economy, this court will treat the defendant's reply brief to the State's original response brief as a reply brief to the State's corrected brief.

¶ 26    The defendant argues that his conviction should be reversed because the State failed to prove beyond a reasonable doubt that he committed first-degree murder under a theory of accountability, where the shooter was unknown and the weapon that was used to kill Lee was unknown. Even if the State's evidence could be believed, he contends, it only showed that the defendant was shooting at Iesha and her friends, while Lee was nowhere in sight. The defendant argues that the State failed to present the testimony of any witnesses who saw "anyone else shoot at [Iesha] before [Lee] was shot," that the State failed to present any facts that connected the defendant's friends to the fatal bullet, and that the physical evidence implicated numerous unknown potential shooters. He contends that instead of charging the defendant for a crime against Iesha, the State "overcharged" him with the first-degree murder of Lee on a theory of accountability. Specifically, the defendant claims that, even viewing the evidence in the light most favorable to the State, the evidence was insufficient to prove, beyond a reasonable doubt, all of the elements of the theory of accountability.

¶ 27 The State counters that the defendant was proven guilty beyond a reasonable doubt of first-degree murder under a theory of accountability. Specifically, the State argues that the defendant was properly convicted of the offense because he and his friends participated in a common criminal design that resulted in Lee's death. The State further argues that other factors, such as the defendant's presence during the commission of the crime, his flight from the scene, his failure to report the incident, and his continued association with the other offenders after the shooting, all showed that the defendant was accountable for Lee's death.

¶ 28 When the sufficiency of the evidence is challenged on appeal, we must determine " 'whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond the reasonable doubt.' " (Emphasis in original.) *People v. Graham*, 392 Ill. App. 3d 1001, 1008-09 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court affords great deference to the trier of fact and does not retry the defendant on appeal. *People v. Smith*, 318 Ill. App. 3d 64, 73 (2000). It is within the province of the trier of fact "to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence." *Graham*, 392 Ill. App. 3d at 1009. The trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). A reviewing court will not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the State. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." *Graham*, 392 Ill. App. 3d at 1009.

¶ 29 A person commits first-degree murder when, in performing the acts which cause the death of an individual, (1) he either "intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another"; or (2) "he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(1), (2) (West 2008); *People v. Jones*, 376 Ill. App. 3d 372, 383 (2007).

¶ 30 At trial, the State prosecuted its case against the defendant for first-degree murder under a theory of accountability. A person is legally accountable for the criminal conduct of another when, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2008).

¶ 31 To prove that a defendant had the intent to promote or facilitate the crime, the State must present evidence that establishes, beyond a reasonable doubt, "that (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. In the case at bar, the State does not argue that the defendant shared the criminal intent of the person who shot Lee. Rather, the State advanced its case on the theory that there was a "common criminal design" by which the defendant showed the intent to promote or facilitate the killing of Lee. The common design rule holds that "where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the

further acts." *In re W.C.*, 167 Ill. 2d 307, 337 (1995). "Words of agreement are not required to prove a common design or purpose between codefendants; a common design may be inferred from the circumstances surrounding the crime." *Willis*, 2013 IL App (1st) 110233, ¶ 79. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d at 338. "A conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group." *People v. Cooper*, 194 Ill. 2d 419, 435 (2000). "In determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during its commission, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene." *Willis*, 2013 IL App (1st) 110233, ¶ 79. " 'Absent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability; however, they do constitute circumstantial evidence which may tend to prove and establish a defendant's guilt.' " *Willis*, 2013 IL App (1st) 110223, ¶ 79 (quoting *People v. Foster*, 198 Ill. App. 3d 986, 993 (1990)). A defendant may be found guilty under an accountability theory even though the identity of the principal is unknown. *Cooper*, 194 Ill. 2d at 435.

¶ 32    With regard to the intent element of accountability under the facts of this case, we find that the State failed to establish that there existed a common criminal design between the defendant and the multitude of armed partygoers who participated in the shooting melee that ended in Lee's death. There was evidence that many men in the crowd, including, but not necessarily limited to, defendant and his friends, were armed with guns. The scene was described as chaotic once the shooting started. There is also evidence that Lee was alive when the shooting started. In defendant's videotaped statement, he claims that Keevo accidentially shot Lee. The State never embraced that evidence. The State argued instead that Lee's killer was unknown. At trial, the State presented evidence that the defendant and a "whole crowd of boys," engaged in a verbal and physical altercation with Iesha and her friends, including "baby daddy." Moments later gunfire erupted. It is unclear where that gunfire originated. The State's evidence revealed that at some point, the defendant shot at Iesha and Elaina as they fled southbound on South Keeler Avenue. It is unclear from the evidence when Lee was shot. Tytianna testified that she heard about 25 to 30 gunshots fired from multiple guns during the melee and observed Pooh Bear shooting a gun in the air. Trial testimony also established that there were hundreds of people at the party and that many, if not most, of the men were armed with guns. There was no evidence that the multitude of armed men were all members of defendant's "crew." There was also evidence that at least 26 shell casings, a fired bullet, and a bullet jacket were found at the scene. However, given the amount of shooting, it can be inferred that there were revolvers in the mix as well. The State's evidence technician, Balcerzak, testified that revolvers would not leave behind shell casings after being fired. In other words, it is impossible to know how many guns were at the party and who was firing them.

¶ 33    The defendant makes a reasonable argument that the State has not addressed satisfactorily. Specifically, the defendant argues that it is insufficient to show that multiple illegal acts occurred in the same vicinity without showing the common link between or among the actors. In the case at bar, a theory of accountability for Lee's murder under these facts presented significant evidentiary challenges for the State.

¶ 34    The State has conceded that its theory of accountability is not based on a common criminal intent between the shooter and defendant. Therefore, the State was required to show that there was a common criminal design between defendant and the shooter who killed Lee. The State was required to do so under the facts of this case. Consequently, the defendant is able to make a convincing argument that the State charged him with the wrong crime or "overcharged" him with the murder of Lee.

¶ 35    It is undisputed that there was evidence that defendant fired shots at Iesha. Yet, that is not the crime for which the State chose to charge and try defendant. Inexplicably, the State chose to try defendant for the murder of Lee on a theory of accountability when the evidence did not provide proof of either a shared criminal intent (which is conceded) or a common criminal design. We note that the State has complete discretion to determine the charge or charges that will be levied against a defendant. It is also the State's responsibility to ensure that the facts and the proof required to meet the burden beyond a reasonable doubt are consistent with the crime charged. In this case the State has failed to do so. Thus, at most, we find that the State's evidence showed that an unidentified person killed Lee but that the defendant shot at Iesha and Elaina. Therefore, in order to establish a common criminal design, the State must prove beyond a reasonable doubt that the unknown shooter was a part of the defendant's alleged criminal design to shoot Iesha and her friends but instead killed Lee while he was acting in furtherance of the plan that he and defendant had in common. Although the defendant claimed in his videotaped statement that Keevo, Pooh Bear, and Pee Wee fired their guns in retaliation against Iesha and her friends, those shots were described as being discharged *after* Lee had already been shot and, thus, could not be a basis for proving accountability for the shooting. See 720 ILCS 5/5-2(c) (West 2008) (a person is legally accountable for the criminal conduct of another when, "[e]ither *before or during* the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense" (emphasis added)). No evidence was presented by the State that anyone other than the defendant shot at Iesha or Elaina. Although someone in the group of "boys" yelled, "[s]hoot them ho's, [s]hoot them ho's," that person was never identified and there was no evidence that any one in that group fired a gun. Aside from the defendant, the only other person identified by a witness at trial as having shot a gun was Pooh Bear, who fired into the air. Thus, we find that the State could not prove beyond a reasonable doubt that anyone belonging to the defendant's group of "homies" fired gunshots at Iesha and her friends and shot Lee instead.

¶ 36    Even assuming, *arguendo*, that the State's evidence did show that other persons participated in the defendant's criminal design to shoot Iesha and her friends, no direct or circumstantial evidence established that any one of those participants was the shooter who killed Lee. While it was undisputed that the defendant was present at the crime scene, and evidence showed that the defendant and his friends were armed at the party, the evidence was insufficient to prove that the unidentified shooter was a member of the defendant's alleged criminal design to shoot Iesha and her friends but instead killed Lee unintentionally while acting in furtherance of the plan. As discussed, hundreds of people attended the party, where most of the men were armed and not all of them belonged to the defendant's "crew," and forensic evidence recovered from the scene revealed that at least 28 gunshots from seven different firearms had been fired during the shooting–yielding the possibility of numerous unknown potential shooters who may or may not have been associated with the defendant. The

- 12 -

police only recovered one out of the seven firearms during their investigation. Because the fatal bullet that struck Lee had exited his body, its caliber remained unknown and it could not be traced to a particular weapon or shooter.

¶ 37 We note that individuals committing crimes in the vicinity of each other cannot automatically be held accountable for each other's criminal acts. Rather, where there were multiple shooters at the party, the State must show that Lee's unidentified shooter shared in the defendant's alleged criminal design thereby establishing the "common" link between them. See *Fagan v. Washington*, 942 F.2d 1155, 1160 (7th Cir. 1991) (reversing accountability murder conviction on the basis that the trial court "assumed," absent any evidence, "that the bullet that killed [the victim] must have come from a gun fired by one of the [members from defendant's gang]"). Absent this showing, it is not difficult to imagine other scenarios by which Lee was shot. For example, someone who had a personal grudge against Lee could have used the chaos and confusion of the brawl and shoot-out at the party as a convenient pretext to shoot him with minimal risk of detection. See *id.* at 1159. Based on the evidence, we find that the State has not established a factual link between the bullet that killed Lee and any shooter in general, let alone any shooter sharing an alleged common criminal design with the defendant to shoot Iesha and her friends.

¶ 38 The State cites *People v. Terry*, 99 Ill. 2d 508 (1984), and *People v. Kessler*, 57 Ill. 2d 493 (1974), in support of its arguments that the evidence was sufficient to convict the defendant of murder on a theory of accountability. However, we find these cases to be distinguishable from the facts in the case at bar, where neither *Terry* nor *Kessler* involved an unknown principal and the perpetrator in each of those cases shared in a common criminal design with the defendant. See *Terry*, 99 Ill. 2d at 517-18 (evidence sufficient to find defendants guilty of murder on a theory of accountability, where codefendant Myers stabbed the victim while they were committing battery against him); *Kessler*, 57 Ill. 2d at 499 (evidence sufficient to convict defendant of attempted murder, where defendant told two companions where he had seen large sums of money and remained inside the car while the two companions burglarized the premises and shot the tavern owner and a police officer during the burglary). Unlike *Terry* and *Kessler*, evidence at trial in the instant case failed to establish that the unidentified shooter was a member of the defendant's alleged criminal design and that he was acting in furtherance of defendant's plan to shoot Iesha and her friends or anyone else when he unintentionally shot Lee. Thus, we find that the State failed to prove beyond a reasonable doubt that there was a common criminal design between defendant and Lee's killer, so as to establish the defendant's intent to promote or facilitate the crime. See *People v. Perez*, 189 Ill. 2d 254, 269 (2000) (holding that there was insufficient evidence that defendant shared gang member/shooter's criminal intent, or that he was engaged in a common criminal design, to support a murder conviction on an accountability theory). Therefore, we hold that the evidence was insufficient to convict the defendant of first-degree murder under an accountability theory.

¶ 39 We note that it is quite possible that the defendant could have been successfully prosecuted for murder under a different theory, such as felony murder predicated upon mob action, or could have been prosecuted for the attempted murder of Iesha. However, the State chose to charge the defendant with first-degree accountability murder and "must live with the consequences of having proceeded on a theory that it could not establish with the certitude required in criminal cases." *Fagan*, 942 F.2d at 1160. Accordingly, we reverse the defendant's first-degree murder conviction and vacate his sentence on this conviction.

- 13 -

¶ 40     We next determine whether the State established beyond a reasonable doubt that the defendant was an armed habitual criminal.

¶ 41     Outside the presence of the jury at trial, the State introduced into evidence two certified copies of the defendant's previous convictions: (1) a certified copy of a January 9, 2007 felony conviction for possession of a controlled substance with intent to deliver, in violation of section 401(d)(i) (720 ILCS 570/401(d)(i) (West 2006)) (case No. 06 CR 2687101); and (2) a certified copy of a February 1, 2002 felony conviction for aggravated unlawful use of a weapon, in violation of section 24-1.6(a)(1) (720 ILCS 5/24-1.6(a)(1) (West 2002)) (case No. 01 CR 1233801). During jury deliberations, the trial court conducted a simultaneous bench trial and found the defendant guilty of being an armed habitual criminal. In sentencing the defendant for first-degree murder, the trial court imposed a concurrent 20-year sentence for the armed habitual criminal conviction.

¶ 42     The defendant argues on appeal that his armed habitual criminal conviction should be reversed because the State failed to prove beyond a reasonable doubt that he had two qualifying convictions to satisfy the necessary elements of the armed habitual criminal offense. Specifically, he contends that his 2002 felony conviction for aggravated unlawful use of a weapon, a predicate offense to the armed habitual criminal offense, was void because the statute under which he was convicted for the 2002 felony was declared unconstitutional by our supreme court's decision in *People v. Aguilar*, 2013 IL 112116.

¶ 43     The State counters that the defendant's armed habitual criminal conviction should be affirmed where his 2002 felony conviction for aggravated unlawful use of a weapon was valid at the time he possessed his handgun in the instant case.

¶ 44     The armed habitual criminal statute provides in pertinent part the following:

     "(a) A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:

          (1) a forcible felony as defined in Section 2-8 of this Code;

          (2) unlawful use of a weapon by a felon; aggravated unlawful use of a weapon; *** or

          (3) any violation of the Illinois Controlled Substances Act or the Cannabis Control Act that is punishable as a Class 3 felony or higher." 720 ILCS 5/24-1.7 (West 2008).

¶ 45     The parties do not dispute that the defendant's prior 2007 felony conviction for possession of a controlled substance with intent to deliver satisfied one of two qualifying offenses under the armed habitual criminal statute. Rather, they disagree on whether his 2002 felony conviction for aggravated unlawful use of a weapon satisfied the second of the two qualifying offenses under the statute.

¶ 46     In *Aguilar*, 2013 IL 112116, our supreme court found the Class 4 version of the aggravated unlawful use of a weapon (AUUW) statute (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2008)) to be unconstitutional in violation of the second amendment right to bear arms. When a statute is declared unconstitutional, it is void *ab initio*, or as though the law had never been passed. See *People v. Tellez-Valencia*, 188 Ill. 2d 523, 526 (1999). The defendant maintains that because his prior conviction for the Class 4 form of AUUW (case No. 01 CR 1233801) is void under *Aguilar*, the State could not rely on this now-void conviction to serve as a predicate

offense for being an armed habitual criminal. Therefore, he argues, the State failed to prove an essential element of the offense of armed habitual criminal. The State counters that since the defendant's 2002 conviction for AUUW was valid at the time he possessed a firearm in the instant case, the State sufficiently proved at trial that he was an armed habitual criminal.

¶ 47    We find that this court has already addressed the same exact issue in *People v. Fields*, 2014 IL App (1st) 110311, and *People v. McFadden*, 2014 IL App (1st) 102939, *appeal allowed*, *People v. McFadden*, No. 117424 (Ill. May 28, 2014). In *Fields* and *McFadden*, this court, relying on *People v. Dunmore*, 2013 IL App (1st) 121170, reversed the defendants' convictions at issue in those cases and held that each defendant's prior conviction for AUUW under the statute that had been declared unconstitutional by *Aguilar* could not serve as a predicate offense for the defendant's armed habitual criminal conviction (*Fields*) or unlawful use of a weapon conviction (*McFadden*). We find no reason to deviate from the holdings in *Fields* and *McFadden*. Because the defendant's prior conviction for AUUW was based on a statute that was found to be unconstitutional and void *ab initio* in *Aguilar*, we cannot allow it to stand as a predicate offense for the defendant's armed habitual criminal conviction in the instant case. Thus, we find that the State was required to, but could not, prove beyond a reasonable doubt an element of the offense of armed habitual criminal, where the statute underlying the AUUW conviction was found to be unconstitutional and, thus, the conviction cannot serve as a predicate offense for any charge.

¶ 48    The State maintains that the defendant's armed habitual criminal conviction should be upheld, arguing that *Fields* and *McFadden* were wrongly decided because those cases failed to consider how the defendant's previous AUUW conviction was still valid at the time he possessed the firearm in the instant case. The State contends that "it is the status of the prior felony conviction at the time the defendant possesses the firearm that controls, regardless of whether that prior conviction is later found to be constitutionally invalid or is later expunged." In support, the State cites two federal court cases–*Lewis v. United States*, 445 U.S. 55 (1980), and *United States v. Lee*, 72 F.3d 55 (7th Cir. 1995). We disagree. *Lewis* and *Lee* do not involve predicate felony convictions that were based on an unconstitutional statute and, thus, have no applicability to the facts in the case at bar. Therefore, we reiterate that we have no reason to deviate from the holdings in *Fields* and *McFadden*.

¶ 49    The State also argues that this court has no jurisdiction to consider the merits of the defendant's predicate prior AUUW offense. We emphasize that the defendant's prior conviction for AUUW (case No. 01 CR 1233801) is not at issue here, nor do we make any findings as to whether *Aguilar* would be applicable to that conviction on a collateral attack. We also emphasize that we are not vacating the defendant's AUUW conviction (case No. 01 CR 1233801) pursuant to *Aguilar*. We further decline to address whether formal proceedings for collateral relief may be available to the defendant to vacate his AUUW conviction in that case. Thus, the State's jurisdictional argument is misplaced here. Accordingly, because the State could not prove beyond a reasonable doubt an element of the offense of being an armed habitual criminal, we reverse the defendant's conviction and vacate his sentence for the offense of being an armed habitual criminal.

¶ 50    In light of our holding to reverse both the defendant's conviction for first-degree murder on a theory of accountability and for being an armed habitual criminal, we need not address the remaining issue regarding whether the trial court erred in imposing a 20-year firearm enhancement sentence on the defendant's first-degree murder conviction.

¶ 51    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County.

¶ 52    Reversed.