# Illinois Official Reports

## Appellate Court

---

### *People v. Cowart*, 2017 IL App (1st) 113085-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES COWART, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-3085 |
| Filed<br>Rehearing denied | May 12, 2017<br>June 16, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-13763; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Remanded for resentencing. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Christopher L. Gehrke, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Justices Connors and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a jury trial in the circuit court of Cook County, defendant Charles Cowart was convicted of first degree murder under a theory of accountability. Following a simultaneous bench trial outside the presence of the jury, defendant was also convicted of being an armed habitual criminal (AHC). Subsequently, the trial court sentenced him to 51 years of imprisonment for first degree murder and a concurrent 20-year sentence for the AHC conviction. On appeal, this court reversed both the first degree murder conviction and the AHC conviction. Our supreme court then issued a supervisory order directing us to reconsider that judgment in light of its decision in *People v. McFadden*, 2016 IL 117424. Having done so, we now affirm the defendant's AHC conviction, reverse the defendant's first degree murder conviction, and remand for resentencing.

¶ 2                                                    BACKGROUND

¶ 3        On June 21, 2009, in the late evening, victim Lee Floyd (Lee) was shot and killed at an outdoor party located at West Van Buren Street and South Keeler Avenue in Chicago, Illinois. On June 26, 2009, police officers arrested defendant, who was subsequently charged with the first degree murder of Lee, the offense of being an AHC, and aggravated discharge of a firearm. Defendant asserted in his videotaped statement to the police that one of his friends, Keevo,[1] accidentally shot Lee during the party. Prior to trial, on June 20, 2011, the State decided to proceed with the first degree murder and AHC charges but nol-prossed the remaining charges.

¶ 4        On June 21, 2011, the same day a bench trial commenced on the AHC charge, a jury trial commenced on the first degree murder charge. Tytianna Johnson (Tytianna) testified on behalf of the State that, at about 10:30 p.m. on June 21, 2009, she, Iesha Parker (Iesha), Keyana Williams (Keyana), and Elaina Riley (Elaina) attended a Father's Day outdoor celebration in the area of West Van Buren Street and South Keeler Avenue in Chicago. Tytianna estimated that about 200 people attended the party, including Jasmine Benson (Jasmine) and defendant, whose nickname was "LC." Tytianna noticed a group of "boys standing around" with defendant, including an individual nicknamed "Bird," which she described as the "LC crew." Tytianna noticed that defendant had a gun tucked into his waistband, that he wore a white T-shirt bearing a photograph of someone, and that the "[m]ajority of the whole party" wore the same shirt. Although Tytianna testified at trial that she did not see Bird with a gun, she had previously informed the grand jury and an assistant State's Attorney that Bird had a gun at the party. At some point, Jasmine and Ashley Dockery (Ashley) got into a verbal argument while Tytianna and Ashley's boyfriend, Tommy, stood nearby. About 7 to 10 minutes later, "a whole crowd of boys" stood in front of Tytianna, Iesha, Keyana, and Elaina. The group of about 20 boys included defendant, Bird, "Smooth," and the victim, Lee. Elaina then made a statement, which caused the "whole party" to get "real rowdy" and to turn against the girls. Smooth then threw a drink in Iesha's face, and defendant slapped Iesha. Elaina then hit defendant, who then hit Elaina, and she fell to the ground. The crowd then started "going crazy," and everyone was "swinging." Ralph Benson (Ralph), who was the father of Tytianna's children, then physically pulled Tytianna out of the fight. Moments later, Tytianna heard gunshots and observed "Pooh

---

[1]The spelling of this individual's name varies in the record as "Keevo" or "Kevo."

Bear" shooting a gun in the air. Tytianna and Ralph then hid under a parked truck on the corner of the street. During the incident, Tytianna heard a total of about 25 to 30 gunshots fired from four or five different guns and heard the boys yell, "[s]hoot them ho's, [s]hoot them ho's." Several days later, on June 27, 2009, Tytianna cooperated with the police and identified photographs of the males she saw at the party, including Pooh Bear, Tommy, and Bird, and she also identified defendant in a physical lineup. On cross-examination, Tytianna was impeached with her grand jury testimony, which stated that "[m]ost of the males" she saw at the party had guns in their possession.

¶ 5        Iesha testified that at about 10 p.m. on June 21, 2009, she, Tytianna, Keyana, and Elaina attended an outdoor party in the playground of an elementary school at West Van Buren Street and South Keeler Avenue. Iesha estimated about 50 to 100 people in attendance, and partygoers stood on the sidewalks, yard, and streets. Iesha saw Tommy, Pooh Bear, Keevo, Melissa Meridy (Melissa), and Jasmine at the party. Jasmine engaged in an altercation with Ashley, after which Tommy walked to Jasmine and Melissa on the street corner, said something to them, and walked back toward the elementary school grounds. Elaina then said something to Pooh Bear, which caused "all the guys out there" to walk toward the girls who were on the street corner at West Van Buren Street and South Keeler Avenue at that time. Iesha knew that something was about to happen and started to leave when Smooth or Suavo threw a drink in her face. Defendant then struck Iesha in the face, after which Elaina and defendant engaged in a physical altercation. Iesha described the scene as "[e]veryone just got fighting." When gunshots rang out, Iesha fled southbound on South Keeler Avenue toward a bridge leading to Harrison Street. As she fled, she continued to hear about six or seven gunshots, looked back and saw Elaina fall down, and saw defendant shooting over the bridge at them from the corner of the elementary school. After she reached Harrison Street, Iesha hid under a porch for about 20 minutes. On June 27, 2009, Detective Garcia came to Iesha's home and brought her to the police station, where she identified photographs of Keevo, Bird, Suavo, Tommy, and Pooh Bear. Iesha also identified defendant in a physical lineup and in a statement to an assistant State's Attorney as the person who had shot at her.

¶ 6        Peggy Allen (Peggy) testified that she lived in a first-floor apartment near the intersection of West Van Buren Street and South Keeler Avenue at 4158 West Congress Parkway. In the early morning of June 22, 2009, Peggy awoke to the sounds of gunshots close to her apartment. She looked out the window onto South Keeler Avenue and observed two girls running southbound toward West Congress Parkway and ducking between cars as a young man followed and shot at them. A group of people also followed behind the shooter as the shooter followed the girls. The gunman shot at the girls at least six times—three times before Peggy looked out the window and three times as she watched the incident unfold. After the shooting, Peggy discovered bullet holes in her windows, the dining room, and the kitchen. The next day, Peggy spoke with the police and showed them the damage to her home. Police officers recovered bullets and photographed the damage caused by the gunfire to her residence.

¶ 7        Melissa testified that at about 8 p.m. on June 21, 2009, she and Jasmine attended the barbecue party in an elementary school yard in the area of West Van Buren Street and South Keeler Avenue. Defendant, who wore a T-shirt with a picture on it, was at the party. At some point during the party, Melissa, who was standing in the middle of the street on West Van Buren Street, saw a fight on the corner of West Van Buren Street and South Keeler Avenue. Melissa observed Suavo hit Elaina. Tytianna's boyfriend then picked Tytianna up off the

ground at the corner of West Van Buren Street and South Keeler Avenue. As the fight broke out, Melissa telephoned a friend. After the telephone call, Melissa approached the corner where the fight was occurring and heard about nine gunshots. However, she did not see who was firing the shots. Melissa ducked behind cars as she fled and headed home. On June 28, 2009, Melissa went to the police station and identified defendant, Pooh Bear, Keevo, Tommy and Suavo in a photographic array as individuals who were present at the party. Melissa also informed the police that she had observed Pee Wee flashing a gun before the fight occurred at the party.

¶ 8    Roceaser Ivy (Roceaser) testified that he met defendant in 2006 and that he came into contact with defendant again in 2008. At trial, Roceaser initially denied that he was ever in the area of West Van Buren Street and South Keeler Avenue on the evening of June 21, 2009, or the early morning hours of June 22, 2009. He denied witnessing defendant's involvement in a shooting at that location. Although Roceaser was impeached at trial with his prior statements to the police, the assistant State's Attorney, and the grand jury, in which he said that he had observed defendant shooting a gun on the night of the party, Roceaser testified at trial that he had lied to the authorities and the grand jury because the police had threatened to take his parole away.[2]

¶ 9    Assistant State's Attorney George Canellis (ASA Canellis) testified that on July 2, 2009, he met with Roceaser, who informed ASA Canellis of the details of the shooting. ASA Canellis testified as to Roceaser's testimony before the grand jury, which was published to the jury at trial. In his grand jury testimony, Roceaser testified that, after midnight on June 22, 2009, he was walking down South Keeler Avenue near West Van Buren Street and was trying to buy marijuana. Roceaser estimated that there were about 300 to 400 people outside "celebrating something." As he walked on South Keeler Avenue toward West Van Buren Street, Roceaser saw defendant fire a gun and saw "fire jump from his hand." When the shooting began, Roceaser was walking on the east side of South Keeler Avenue and was two sidewalk "squares" from West Van Buren Street while defendant was standing diagonally across the street next to an elementary school on the southwest corner of the intersection. A crowd of people stood behind defendant. Roceaser informed the grand jury that he had no difficulty observing defendant at the time of the shooting because lighting from the school building shone on defendant. Defendant was wearing a white T-shirt, blue jeans, white tennis shoes, and a white hat. Roceaser's grand jury testimony stated that he heard no gunshots prior to defendant's firing the gun, that defendant had extended his arm and was shooting at somebody rather than up in the air, and that Roceaser initially heard at least five or six shots and fled toward public transportation at West Van Buren Street and Pulaski Road. Roceaser could still hear gunshots as he fled, which became quieter as he got farther away. In his grand jury testimony, Roceaser also stated that he was treated fairly by the police, that the police did not make any threats or promises to him in exchange for his statement, and that ASA Canellis never made any promises to him regarding his parole status.

¶ 10    At the time of trial, the State called former Assistant State's Attorney Jenni Scheck (Scheck) who testified that on July 1, 2009, she and Detective Garcia met with Roceaser and had a conversation with him about the details of the shooting, which was then memorialized in

---

[2]At the time of trial, Roceaser was in federal custody on an unrelated drug charge and had previously been convicted of other felony offenses.

a typewritten statement. At some point during the conversation, Scheck questioned Roceaser alone in the police interview room, and Roceaser never indicated that either Detective Garcia or other police officers threatened to revoke his parole unless he agreed to speak with them. Scheck testified that Roceaser was given the opportunity to make changes and corrections to the statement and that he attested to the accuracy of the statement by signing the bottom of each page. During Scheck's trial testimony, the typewritten statement was admitted into evidence and published before the jury. The typewritten statement of Roceaser stated that after midnight on June 22, 2009, he was looking to buy some marijuana in the area of South Keeler Avenue and West Van Buren Street. As Roceaser headed southbound on South Keeler Avenue near West Van Buren Street, he saw defendant standing across the street near a school at the southwest corner of the intersection. Defendant, who was wearing white tennis shoes, blue jeans, a white T-shirt, and baseball hat, stood under a light emanating from the school building. Roceaser stated that defendant was "with some other people but seemed to be a step ahead of the group." There were also "groups of 15 to 20 people and a bigger group behind the school." Roceaser then observed defendant with a gun in his hand and heard two gunshots. Roceaser saw "fire" come out of defendant's hand as he discharged his weapon "in the direction where other people [were] standing." Roceaser stated that defendant "definitely shot the gun towards people and not up into the air," that he did not hear any gunshots before defendant fired the gun, and that Roceaser then fled upon seeing defendant shoot his gun. After he started running, Roceaser heard other gunshots, which grew fainter as he got farther away. Roceaser also stated in the typewritten statement that he was treated well by the detectives and Scheck, that he was given food by the police, that he was allowed to use the restroom whenever he needed to, that he was not handcuffed at any time at the police station, and that no threats or promises had been made to coerce him to make a statement, that he gave the statement freely and voluntarily, that he was allowed to make any changes or corrections to his statement, that he put his initials by the changes or corrections that were made, and that everything contained in the statement was true and accurate.

¶ 11 Officer Kevin Ebersole (Officer Ebersole) testified that at 12:30 a.m. on June 26, 2009, several days after the shooting, he and his partner, Officer Suing, were on routine patrol when they received a radio flash message of a vehicle and occupant who had been involved in an incident at Lake Street and Homan Avenue. About a minute later, as the officers headed southbound on Homan Avenue, Officer Ebersole spotted the vehicle matching the description in the flash message. Once the police stopped the vehicle, the front passenger exited the vehicle with a "nickel or chrome-plated" handgun in his hand and thereafter placed the gun into his waistband. At trial, Officer Ebersole identified defendant as the individual he observed exiting the vehicle. Officer Ebersole testified that defendant exited the vehicle and fled westbound on Ohio Street and into an alley near Trumbull Avenue. During the pursuit, Officer Ebersole observed defendant throw the handgun onto the roof of a garage near 512 North Trumbull Avenue. Moments later, Officer Ebersole apprehended defendant. Other police officers then recovered the handgun from the roof of the garage where defendant had tossed it.

¶ 12 Officer Nick Beckman (Officer Beckman) testified that on June 26, 2009, he arrived at the 500 block of North Trumbull Avenue and spoke with police officers who were already at the location. He was directed by other officers to the roof of a garage at 512 North Trumbull Avenue, where he recovered a 9-millimeter semiautomatic handgun with a chrome finish. The handgun's magazine was empty, and Officer Beckman inventoried the weapon. Evidence was

presented by the State at trial that subsequent testing of the handgun showed that it matched three cartridge cases that were recovered from the June 21, 2009, shooting crime scene near 407 South Keeler Avenue.

¶ 13    Detective Gregory Jones (Detective Jones) testified that he investigated the shooting death of Lee. On June 26, 2009, Detective Jones interviewed Roceaser, who identified defendant in a physical lineup as the person who had fired a handgun during the shooting melee on June 21, 2009. On June 27, 2009, Detective Jones also interviewed Iesha, Tytianna, and Keyana. Tytianna identified defendant in a physical lineup as a person she saw "involved in a fight just prior to the shooting and also a person she saw with a handgun in his waistband before the shooting." Tytianna also identified Tommy and Pooh Bear in a photographic array. Iesha viewed the physical lineup separately and also identified defendant as "the person who had punched her in her face with his fists and then fired multiple shots at her as she ran." Iesha further identified Bird, Pooh Bear, Tommy, and Suavo in a photographic array. On June 28, 2009, Detective Jones also interviewed Melissa, who identified Pee Wee, Suavo, Tommy, Keevo, Pooh Bear, Bird, Elaina, Iesha, Lee, Roceaser, Smooth, Fish, Lil One, Chris Rock (Rock), D-Mac, and defendant in a photographic array. Melissa informed Detective Jones that she had seen Pee Wee with a gun prior to the fight, and that Tommy had made threats to shoot anybody who "touches his girl." On June 29, 2009, Detective Jones and his partner also interviewed Ashley, who identified Lee, Melo, Rock, Tommy, Keevo, Pooh Bear, Smooth, Pee Wee, and defendant as being present at the party at the intersection of West Van Buren Street and South Keeler Avenue on June 22, 2009. However, Ashley was not present at the time of the shooting. On July 1, 2009, Detective Jones reinterviewed Roceaser. Detective Jones testified that Roceaser was not placed under arrest or in handcuffs, that no threats were made to him regarding his parole status, that an assistant State's Attorney memorialized a statement made by Roceaser, and that Roceaser testified before the grand jury on July 2, 2009. Detective Jones testified that, in the course of his investigation, he had evidence that "there were multiple people shooting" at the street corner of West Van Buren Street and South Keeler Avenue. On July 6, 2009, Detective Jones conducted another physical lineup with Iesha and Tytianna, from which Iesha identified Tavaris Hightie (Tavaris) as "being at the scene with a gun" and Tytianna identified Tavaris as "one of the people actually shooting a gun." During Detective Jones's testimony at trial, defendant's videotaped statement to the police was published to the jury.

¶ 14    In his videotaped statement, defendant stated that he helped organize the Father's Day celebration for one of his "homies," Boodro, who died eight years earlier. Defendant and many partygoers wore T-shirts with Boodro's picture on the front. The party included food, drinks, a D.J., and a photographer and was located in a schoolyard at West Van Buren Street and South Keeler Avenue. The party was going smoothly until some "females" started to get into a fight with each other, and Bird tried to resolve the dispute by telling a female individual to "get the [expletive] on." Defendant described what unfolded next. Defendant stated that he slapped the female at the corner of West Van Buren Street and South Keeler Avenue, because she was "talking crazy." According to defendant, the "baby daddy" of the woman he had slapped then "hit [defendant's] homie, Smooth." Defendant did not know the identity of the "baby daddy." Defendant stated that when the "baby daddy" hit Smooth, defendant and all of his friends, including Smooth, Marvin, Lee (the victim), Keevo, and Big Greek surrounded the man. Defendant stated that when they had "baby daddy" surrounded in a circle, Keevo said, "watch

- 6 -

out, I'm [fittin] to kill this bitch." Defendant then heard the first gunshot and saw people move back. At that time, Keevo was facing West Van Buren Street and South Keeler Avenue, while the victim, Lee, had his back turned toward that intersection and was facing West Congress Parkway and South Keeler Avenue instead. When the second gunshot sounded, defendant claimed that he saw Lee "roll over on the ground," but defendant did not know at the time that Lee had been shot. Defendant claimed that Keevo accidentally shot Lee when Keevo was trying to "get this bitch." When a third gunshot sounded, defendant heard "all the bullets *** going towards the bridge" near West Congress Parkway, in the direction where "two girls" were running as the shooting began. When asked who was shooting, defendant answered, "Kevo shot first. [Pooh] Bear shot. Pee Wee shot. *** I had my gun out[,] Bird had his gun out." However, defendant denied that either he or Bird fired their weapons but stated that "I had a nine. Bird had a nine. Basically it was a lot of nine's out there it was a few .357 [revolvers]." Defendant noted that he had been shot on multiple occasions in the past and, thus, took his gun out once the shooting began. Defendant stated that "baby daddy" was able to escape by running away. He noted that "baby daddy" got away because once gunshots were heard, "everyone out there wasn't focused." Defendant denied walking with the crowd that followed and shot at the girls who were running toward the bridge. Instead, he claimed that he, Bird, Smooth, and Pee Wee put Lee into Smooth's car, and Smooth drove Lee to the hospital. Defendant claims that he ran to Gladys Avenue to get away from West Van Buren Street and South Keeler Avenue because the police were coming and he still had the gun in his possession. Defendant then gave the gun to someone named "Melva." He did not find out that his "homie" Lee had died until the following morning. Defendant claimed that the handgun that the police recovered from his person several days after the shooting was a different firearm than the one he had in his possession during the shooting.

¶ 15    At trial, after defendant's videotaped statement was played for the jury, Detective Jones testified on cross-examination that, based on his interviews with the witnesses, Lee was standing on the street near the southwest corner of the intersection of West Van Buren Street and South Keeler Avenue when he was shot. Detective Jones estimated that, at the time Lee was shot, there were "several people" directly around him and "a couple hundred people" at the party, and there were several handguns that had been fired at the time Lee was shot. On redirect, Detective Jones testified that the police had not recovered any firearms other than the gun that was recovered from defendant.

¶ 16    Evidence was presented at trial that the police found shell casings and blood at the crime scene. Evidence technicians located and recovered 26 shell casings, a fired bullet, and a bullet jacket from the crime scene, which led Tonia Brubaker (Brubaker), a forensic scientist, to conclude that at least 28 gunshots from six or seven different firearms had been fired at the scene—including two .38-caliber firearms, four 9-millimeter firearms, and one unknown firearm. Stephen Balcerzak (Balcerzak), an evidence technician, also testified that revolvers do not expel shell casings and, thus, would not leave such evidence behind.

¶ 17    The State, outside the presence of the jury, also introduced into evidence two certified copies of defendant's previous convictions: the first was a certified copy of a January 9, 2007, felony conviction for possession of a controlled substance with intent to deliver, in violation of section 401(d)(i) of the Illinois Controlled Substances Act (Act) (720 ILCS 570/401(d)(i) (West 2006)) (case No. 06 CR 2687101); the second was a certified copy of a February 1, 2002, felony conviction for aggravated unlawful use of a weapon, in violation of section

24-1.6(a)(1) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/24-1.6(a)(1) (West 2002)) (case No. 01 CR 1233801).

¶ 18    By stipulation, the parties agreed that Dr. Tera Jones (Dr. Jones) performed the autopsy of Lee's body. Dr. Jones observed a gunshot entrance wound on his right upper back, and the exit wound on his right upper chest. The bullet traveled from "back to front slightly right to left and upward." Examination of the skin around the entrance wound revealed no evidence of close-range firing, which typically occurs when the firearm is less than 18 inches from the victim. The parties stipulated that Dr. Jones would testify within a reasonable degree of medical and scientific certainty that the cause of death was due to a gunshot wound on Lee's back and the manner of death was homicide.

¶ 19    After the State rested, three witnesses testified on behalf of defendant. Antonio Williams (Antonio) is defendant's nephew and was about 14 years old at the time of the shooting. Rekia Williams (Rekia) is Antonio's mother. Tiana Cowart (Tiana) is defendant's wife. Antonio, Rekia, and Tiana testified that they saw defendant fighting with some women when they heard the first gunshots at the Father's Day party. Antonio testified that once the fight broke out, "everybody started fighting." Antonio testified that, before the shots were fired, Lee was standing on the sidewalk by the entrance door of the elementary school, which was about 15 feet away from the corner of West Van Buren Street and South Keeler Avenue. Antonio did not see Lee get struck by a bullet but only saw him fall to the ground. All three witnesses testified that they neither saw defendant in possession of a gun nor fire a weapon and that they fled the scene shortly after they heard the gunshots. Rekia and Tiana also testified that defendant wore a sling on one of his arms on the night of the shooting.

¶ 20    During jury deliberations and outside the presence of the jury, the trial court conducted a simultaneous bench trial and found defendant guilty of being an AHC. Following deliberations, the jury found defendant guilty of first degree murder of Lee and found that he personally discharged a firearm.

¶ 21    On September 23, 2011, the trial court denied defendant's motion for a new trial. The trial court then sentenced defendant to 51 years of imprisonment, which included a 20-year firearm enhancement, and the court imposed a concurrent 20-year sentence for the AHC conviction. On September 30, 2011, the trial court denied defendant's motion to reconsider the sentence. Defendant then appealed.

¶ 22    On February 9, 2015, this court reversed both of defendant's convictions. *People v. Cowart*, 2015 IL App (1st) 113085. In reversing the first degree murder conviction, we held that "the State failed to prove beyond a reasonable doubt that there was a common criminal design between defendant and Lee's killer, so as to establish defendant's intent to promote or facilitate the crime." *Id.* ¶ 38. In reversing the AHC conviction, we held that the State failed to prove the predicate offenses for AHC because defendant's prior conviction for aggravated unlawful use of a weapon (AUUW) was based on a statute found to be unconstitutional in *People v. Aguilar*, 2013 IL 112115. *Cowart*, 2015 IL App (1st) 113085, ¶ 47.

¶ 23    In September 2016, our supreme court issued a supervisory order directing us to vacate our February 9, 2015, judgment and to reconsider that judgment in light of its decision in *People v. McFadden*, 2016 IL 117424. Both defendant and the State submitted supplemental briefs. Having reconsidered in accordance with the supreme court's mandate, we now affirm the defendant's AHC conviction, reverse the defendant's first degree murder conviction, and

remand for resentencing.

¶ 24                                    ANALYSIS

¶ 25        We note that we have jurisdiction as defendant filed a timely notice of appeal following a final order pursuant to Illinois Supreme Court Rule 606 (eff. Dec. 11, 2014).

¶ 26        We determine the following issues on appeal: (1) whether the State established beyond a reasonable doubt that defendant committed first degree murder under a theory of accountability, (2) whether the State established beyond a reasonable doubt that defendant committed the offense of AHC in light of *McFadden*, and (3) whether the trial court erred in imposing a 20-year firearm enhancement sentence on defendant's first degree murder conviction.

¶ 27        We first determine whether the State established beyond a reasonable doubt that defendant committed first degree murder on a theory of accountability.[3]

¶ 28        As a preliminary matter, defendant points out in his reply brief that the State's response brief makes various references to gang evidence, which had not been presented at trial, and asks that this court strike or ignore these gang-related references. We agree that the State's original brief makes gang-related references from portions of the transcript of defendant's videotaped statement that was not played for the jury. However, in December 2014, this court granted the State leave to file a corrected brief, which removed from the brief all gang-related references that were not admitted at trial. The corrected brief did not make any substantive changes to the State's arguments regarding the issues on appeal. Also, in the interest of judicial economy, this court will treat defendant's reply brief to the State's original response brief as a reply brief to the State's corrected brief.

¶ 29        Defendant argues that his conviction should be reversed because the State failed to prove beyond a reasonable doubt that he committed first degree murder under a theory of accountability, where the shooter was unknown and the weapon that was used to kill Lee was unknown. Even if the State's evidence could be believed, he contends, it only showed that defendant was shooting at Iesha and her friends, while Lee was nowhere in sight. Defendant argues that the State failed to present the testimony of any witnesses who saw "anyone else shoot at [Iesha] before [Lee] was shot," that the State failed to present any facts that connected defendant's friends to the fatal bullet, and that the physical evidence implicated numerous unknown potential shooters. He contends that instead of charging defendant for a crime against Iesha, the State "overcharged" him with the first degree murder of Lee on a theory of accountability. Specifically, defendant claims that, even viewing the evidence in the light most favorable to the State, the evidence was insufficient to prove beyond a reasonable doubt, all of the elements of the theory of accountability.

¶ 30        The State counters that defendant was proven guilty beyond a reasonable doubt of first degree murder under a theory of accountability. Specifically, the State argues that defendant

---

[3]The issue of first degree murder in this case is outside the scope of the supreme court's supervisory order, as the *McFadden* decision has no bearing on the first degree murder conviction. While we are not precluded from reconsidering issues outside the scope of the mandate, the State does not provide any new arguments in support of a first degree murder conviction. See, *e.g.*, *People v. Warren*, 2016 IL App (1st) 090884-C. Therefore, our analysis on this issue is unchanged from our February 9, 2015, vacated judgment.

was properly convicted of the offense because he and his friends participated in a common criminal design that resulted in Lee's death. The State further argues that other factors, such as defendant's presence during the commission of the crime, his flight from the scene, his failure to report the incident, and his continued association with the other offenders after the shooting, all showed that defendant was accountable for Lee's death.

¶ 31  When the sufficiency of the evidence is challenged on appeal, we must determine " 'whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond the reasonable doubt.' " (Emphasis in original.) *People v. Graham*, 392 Ill. App. 3d 1001, 1008-09 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court affords great deference to the trier of fact and does not retry defendant on appeal. *People v. Smith*, 318 Ill. App. 3d 64, 73 (2000). It is within the province of the trier of fact "to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence." *Graham*, 392 Ill. App. 3d at 1009. The trier of fact is not required to accept any possible explanation compatible with defendant's innocence and elevate it to the status of reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). A reviewing court will not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the State. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." *Graham*, 392 Ill. App. 3d at 1009.

¶ 32  A person commits first degree murder when, in performing the acts which cause the death of an individual, (1) he either "intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another" or (2) "he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(1), (2) (West 2008); *People v. Jones*, 376 Ill. App. 3d 372, 383 (2007).

¶ 33  At trial, the State prosecuted its case against defendant for first degree murder under a theory of accountability. A person is legally accountable for the criminal conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2008).

¶ 34  To prove that a defendant had the intent to promote or facilitate the crime, the State must present evidence that establishes, beyond a reasonable doubt, "that (1) defendant shared the criminal intent of the principal or (2) there was a common criminal design." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. In the case at bar, the State does not argue that defendant shared the criminal intent of the person who shot Lee. Rather, the State advanced its case on the theory that there was a "common criminal design" by which defendant showed the intent to promote or facilitate the killing of Lee. The common design rule holds that "where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *In re W.C.*, 167 Ill. 2d 307, 337 (1995). "Words of agreement are not required to prove a common design or purpose between codefendants; a common design may be inferred from the

circumstances surrounding the crime." *Willis*, 2013 IL App (1st) 110233, ¶ 79. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d at 338. "A conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group." *People v. Cooper*, 194 Ill. 2d 419, 435 (2000). "In determining a defendant's legal accountability, the trier of fact may consider defendant's presence during its commission, defendant's continued close association with other offenders after its commission, defendant's failure to report the crime, and defendant's flight from the scene." *Willis*, 2013 IL App (1st) 110233, ¶ 79. " 'Absent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability; however, they do constitute circumstantial evidence which may tend to prove and establish a defendant's guilt.' " *Id.* (quoting *People v. Foster*, 198 Ill. App. 3d 986, 993 (1990)). A defendant may be found guilty under an accountability theory even though the identity of the principal is unknown. *Cooper*, 194 Ill. 2d at 435.

¶ 35    With regard to the intent element of accountability under the facts of this case, we find that the State failed to establish that there existed a common criminal design between defendant and the multitude of armed partygoers who participated in the shooting melee that ended in Lee's death. There was evidence that many men in the crowd, including, but not necessarily limited to, defendant and his friends, were armed with guns. The scene was described as chaotic once the shooting started. There is also evidence that Lee was alive when the shooting started. In defendant's videotaped statement, he claims that Keevo accidentally shot Lee. The State never embraced that evidence. The State argued instead that Lee's killer was unknown. At trial, the State presented evidence that defendant and a "whole crowd of boys," engaged in a verbal and physical altercation with Iesha and her friends, including "baby daddy." Moments later gunfire erupted. It is unclear where that gunfire originated. The State's evidence revealed that at some point, defendant shot at Iesha and Elaina as they fled southbound on South Keeler Avenue. It is unclear from the evidence when Lee was shot. Tytianna testified that she heard about 25 to 30 gunshots fired from multiple guns during the melee and observed Pooh Bear shooting a gun in the air. Trial testimony also established that there were hundreds of people at the party and that many, if not most of the men, were armed with guns. There was no evidence that the multitude of armed men were all members of defendant's "crew." There was also evidence that at least 26 shell casings, a fired bullet, and a bullet jacket were found at the scene. However, given the amount of shooting, it can be inferred that there were revolvers in the mix as well. The State's evidence technician, Balcerzak, testified that revolvers would not leave behind shell casings after being fired. In other words, it is impossible to know how many guns were at the party and who was firing them.

¶ 36    Defendant makes a reasonable argument that the State has not addressed satisfactorily. Specifically, defendant argues that it is insufficient to show that multiple illegal acts occurred in the same vicinity without showing the common link between or among the actors. In the case at bar, a theory of accountability for Lee's murder under these facts presented significant evidentiary challenges for the State.

¶ 37    The State has conceded that its theory of accountability is not based on a common criminal intent between the shooter and defendant. Therefore, the State was required to show that there

- 11 -

was a common criminal design between defendant and the shooter who killed Lee. The State was required to do so under the facts of this case. Consequently, defendant is able to make a convincing argument that the State charged him with the wrong crime or "overcharged" him with the murder of Lee.

¶ 38    It is undisputed that there was evidence that defendant fired shots at Iesha. Yet, that is not the crime for which the State chose to charge and try defendant. Inexplicably, the State chose to try defendant for the murder of Lee on a theory of accountability, when the evidence did not provide proof of either a shared criminal intent (which is conceded) or a common criminal design. We note that the State has complete discretion to determine the charge or charges that will be levied against a defendant. It is also the State's responsibility to ensure that the facts and the proof required to meet the burden beyond a reasonable doubt are consistent with the crime charged. In this case the State has failed to do so. Thus, at most, we find that the State's evidence showed that an unidentified person killed Lee but that defendant shot at Iesha and Elaina. Therefore, in order to establish a "common criminal design," the State must prove beyond a reasonable doubt that the unknown shooter was a part of defendant's alleged criminal design to shoot Iesha and her friends but instead killed Lee while he was acting in furtherance of the plan that he and defendant had in common. Although defendant claimed in his videotaped statement that Keevo, Pooh Bear, and Pee Wee fired their guns in retaliation against Iesha and her friends, those shots were described as being discharged *after* Lee had already been shot and, thus, could not be a basis for proving accountability for the shooting. See 720 ILCS 5/5-2(c) (West 2008) (a person is legally accountable for the criminal conduct of another when, "[e]ither *before or during* the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense" (emphasis added)). No evidence was presented by the State that anyone other than defendant shot at Iesha or Elaina. Although someone in the group of "boys" yelled, "[s]hoot them ho's, [s]hoot them ho's," that person was never identified and there was no evidence that any one in that group fired a gun. Aside from defendant, the only other person identified by a witness at trial as having shot a gun was Pooh Bear, who fired into the air. Thus, we find that the State could not prove beyond a reasonable doubt that anyone belonging to defendant's group of "homies" fired gunshots at Iesha and her friends and shot Lee instead.

¶ 39    Even assuming, *arguendo*, that the State's evidence did show that other persons participated in defendant's criminal design to shoot Iesha and her friends, no direct or circumstantial evidence established that any one of those participants was the shooter who killed Lee. While it was undisputed that defendant was present at the crime scene and evidence showed that defendant and his friends were armed at the party, the evidence was insufficient to prove that the unidentified shooter was a member of defendant's alleged criminal design to shoot Iesha and her friends but instead killed Lee unintentionally while acting in furtherance of the plan. As discussed, hundreds of people attended the party, where most of the men were armed and not all of them belonged to defendant's "crew," and forensic evidence recovered from the scene revealed that at least 28 gunshots from seven different firearms had been fired during the shooting—yielding the possibility of numerous unknown potential shooters who may or may not have been associated with defendant. The police only recovered one out of the seven firearms during their investigation. Because the fatal bullet that struck Lee had exited his

body, its caliber remained unknown and it could not be traced to a particular weapon or shooter.

¶ 40    We note that individuals committing crimes in the vicinity of each other cannot automatically be held accountable for each other's criminal acts. Rather, where there were multiple shooters at the party, the State must show that Lee's unidentified shooter shared in defendant's alleged criminal design thereby establishing the "common" link between them. See *Fagan v. Washington*, 942 F.2d 1155, 1160 (7th Cir. 1991) (reversing accountability murder conviction on the basis that the trial court "assumed," absent any evidence, "that the bullet that killed [the victim] must have come from a gun fired by one of the [members from defendant's gang]"). Absent this showing, it is not difficult to imagine other scenarios by which Lee was shot. For example, someone who had a personal grudge against Lee could have used the chaos and confusion of the brawl and shoot-out at the party as a convenient pretext to shoot him with minimal risk of detection. See *id.* at 1159. Based on the evidence, we find that the State has not established a factual link between the bullet that killed Lee and any shooter in general, let alone any shooter sharing an alleged common criminal design with defendant to shoot Iesha and her friends.

¶ 41    The State cites *People v. Terry*, 99 Ill. 2d 508 (1984), and *People v. Kessler*, 57 Ill. 2d 493 (1974), in support of its arguments that the evidence was sufficient to convict defendant of murder on a theory of accountability. However, we find these cases to be distinguishable from the facts in the case at bar, where neither *Terry* nor *Kessler* involved an unknown principal and the perpetrator in each of those cases shared in a common criminal design with defendant. See *Terry*, 99 Ill. 2d at 517-18 (evidence sufficient to find defendants guilty of murder on a theory of accountability where codefendant Myers stabbed the victim while they were committing battery against him); *Kessler*, 57 Ill. 2d at 499 (evidence sufficient to convict defendant of attempted murder where defendant told two companions where he had seen large sums of money and remained inside the car while the two companions burglarized the premises and shot the tavern owner and a police officer during the burglary). Unlike *Terry* and *Kessler*, evidence at trial in the instant case failed to establish that the unidentified shooter was a member of defendant's alleged criminal design and that he was acting in furtherance of defendant's plan to shoot Iesha and her friends, or anyone else, when he unintentionally shot Lee. Thus, we find that the State failed to prove beyond a reasonable doubt that there was a common criminal design between defendant and Lee's killer, so as to establish defendant's intent to promote or facilitate the crime. See *People v. Perez*, 189 Ill. 2d 254, 269 (2000) (holding that there was insufficient evidence that defendant shared gang member/shooter's criminal intent, or that he was engaged in a common criminal design, to support a murder conviction on an accountability theory). Therefore, we hold that the evidence was insufficient to convict defendant of first degree murder under an accountability theory.

¶ 42    We note that it is quite possible that defendant could have been successfully prosecuted for murder under a different theory, such as felony murder predicated upon mob action, or could have been prosecuted for the attempted murder of Iesha. However, the State chose to charge defendant with first degree accountability murder and "must live with the consequences of having proceeded on a theory that it could not establish with the certitude required in criminal cases." *Fagan*, 942 F.2d at 1160. Accordingly, we reverse defendant's first degree murder conviction and vacate his sentence on this conviction.

¶ 43    We next determine whether the State offered evidence that could prove beyond a reasonable doubt that defendant was an AHC in light of *McFadden*. Specifically, defendant asserts that the State did not prove the required predicate offenses because his prior AUUW conviction was void.

¶ 44    Outside the presence of the jury at trial, the State introduced into evidence two certified copies of defendant's previous convictions: (1) a certified copy of a January 9, 2007, felony conviction for possession of a controlled substance with intent to deliver, in violation of section 401(d)(i) (720 ILCS 570/401(d)(i) (West 2006)) (case No. 06 CR 2687101) and (2) a certified copy of a February 1, 2002, felony conviction for AUUW, in violation of section 24-1.6(a)(1) (720 ILCS 5/24-1.6(a)(1) (West 2002)) (case No. 01 CR 1233801). During jury deliberations, the trial court conducted a simultaneous bench trial and found defendant guilty of being an AHC. In sentencing defendant for first degree murder, the trial court imposed a concurrent 20-year sentence for the AHC conviction.

¶ 45    We first review the *McFadden* decision. *McFadden* concerned a direct appeal from an unlawful use of a weapon by a felon (UUWF) conviction, based on the defendant's possession of a firearm when he had previously been convicted of aggravated unlawful use of a weapon (AUUW). *McFadden* defendant's prior AUUW conviction was based on the AUUW statutory provision found to be unconstitutional in *Aguilar*. See *Aguilar*, 2013 IL 112116 (concluding that the Class 4 version of the AUUW statute (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2008)) was unconstitutional because it violated the second amendment right to bear arms). Similar to the defendant's argument regarding the AHC offense in this case, the defendant in *McFadden* argued that *Aguilar* prevented use of the prior AUUW conviction to serve as a predicate offense for the UUWF charge.

¶ 46    On appeal, this court agreed with the *McFadden* defendant and vacated his UUWF conviction. *People v. McFadden*, 2014 IL App (1st) 102939. However, the supreme court reversed, reasoning that the defendant's felon status was unaffected by *Aguilar*; thus, unless the prior conviction was vacated, the prior conviction precluded the defendant from legally possessing a firearm. *McFadden*, 2016 IL 117424, ¶ 31 ("Although *Aguilar* may provide a basis for vacating defendant's prior 2002 AUUW conviction, *Aguilar* did not automatically overturn that judgment of conviction. Thus, at the time defendant committed the UUW by a felon offense, defendant had a judgment of conviction that had not been vacated and that made it unlawful for him to possess firearms.").

¶ 47    The supreme court in *McFadden* relied largely on the United States Supreme Court's holding "that under a federal felon-in-possession-of-a-firearm statute, a constitutionally infirm prior felony conviction could be used by the government as the predicate felony." *Id.* ¶ 22 (citing *Lewis v. United States*, 445 U.S. 55, 65 (1980)). *McFadden* approvingly cited *Lewis*'s reasoning in holding that an AUUW conviction subject to vacatur under *Aguilar* may still serve as a predicate for a UUWF conviction.

¶ 48    In *McFadden*, the supreme court recognized that "the fact of a felony conviction without any intervening vacatur or other affirmative action to nullify the conviction triggers the firearms disability" (*McFadden*, 2016 IL 117424, ¶ 24) and applied this reasoning to the UUWF statute, which prohibited possession of a firearm by any person who " 'has been convicted of a felony under the laws of this State or any other jurisdiction.' " *Id.* ¶ 27 (quoting 720 ILCS 5/24-1.1(a) (West 2008)). The supreme court reasoned that the UUWF statute "requires the State to prove only the defendant's felon status" and did not suggest "any intent

- 14 -

to limit the language to only those persons whose prior felony convictions are not later subject to vacatur." (Internal quotation marks omitted.) *Id.*

¶ 49 Defendant's supplemental briefing makes two primary arguments attempting to distinguish *McFadden* from his case, which concern the use of the same prior AUUW felony as a predicate for the AHC offense. The defendant's primary argument is that the AHC statute is distinguishable from either the UUWF statute at issue in *McFadden* or the federal statute at issue in *Lewis*, such that *McFadden* should not apply to support an AHC conviction based on the form of AUUW invalided by *Aguilar*. The defendant emphasizes that the UUWF offense merely requires proof of the defendant's felon *status* based on *any* prior felony. See 220 ILCS 5/24-1.1(a) (West 2012). He argues that this generic "felon status" principle was the basis for *McFadden*'s holding that a prior unconstitutional AUUW conviction could serve as a predicate offense for UUWF.

¶ 50 In contrast to the status crime of UUWF, he urges that the AHC statute punishes particular conduct because it enumerates specific offenses that can serve as the predicate felonies. He urges that the AHC statute does not present the sort of broad sweeping firearm disability imposed by the UUWF statute at issue in *McFadden* or the federal statute at issue in *Lewis*. Thus, he claims that the reasoning in those decisions does not apply here. Notably, virtually identical arguments were considered and rejected by this court in *People v. Perkins*, 2016 IL App (1st) 150889, and *People v. Faulkner*, 2017 IL App (1st) 132884. Those cases concluded that *McFadden*'s logic applies to allow a prior AUUW conviction, premised on the statutory provision held invalid in *Aguilar*, to serve as a predicate for an AHC conviction. We reach the same conclusion in this case.

¶ 51 The second argument raised by the defendant opposing the application of *McFadden* has also been repeatedly rejected by our court. Specifically, the defendant asserts that United States Supreme Court precedent, including *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), and *Ex parte Siebold*, 100 U.S. 371 (1880), precludes the use of a prior conviction, premised on a statute later held unconstitutional, as a predicate for the AHC offense. He argues that this precedent undercuts *McFadden*, which contains no discussion of *Montgomery* or *Siebold*. As we have before in other recent opinions, we reject the defendant's attempt to argue that *McFadden*'s reasoning cannot apply to an AHC conviction. *Faulkner*, 2017 IL App (1st) 132884; *Perkins*, 2016 IL App (1st) 150889.

¶ 52 The defendant asserts that *Montgomery* and other United States Supreme Court decisions establish "that States cannot punish citizens, whether directly or collaterally, under a law that is *facially unconstitutional*." He asserts that our supreme court's decision in *McFadden* and our court's decision in *Perkins* violate this principle by holding that a facially unconstitutional conviction for AUUW may still be used as a predicate for a separate offense until the prior conviction is vacated. In essence, he argues that his conduct leading to the prior AUUW conviction was legal behavior in light of *Aguilar*, such that the AUUW conviction was void and cannot serve as a predicate offense.

¶ 53 This court has rejected the argument (repeated by the defendant in this case) that our supreme court's decision in *McFadden* violates the holding in *Montgomery*:

"Perkins contends that our supreme court 'ignored' the decision in *Montgomery*. But as the State points outs, prior to oral argument in *McFadden*, counsel sought and was granted leave to cite *Montgomery* as additional authority. In that motion, counsel advanced the same arguments presented here. In response, the State argued, as it does

here, that *Montgomery* posed no constitutional impediment to affirmance of defendant's UUWF conviction given that defendant was not seeking to vacate his prior conviction \*\*\*, but instead was challenging his status as a convicted felon at the time of his trial. The State argued that in this context, *Lewis v. United States* [citation], which held that a defendant's failure to vacate a prior felony conviction on grounds that it was unconstitutional was fatal to a challenge to a felon-in-possession conviction, controlled. We agree with the State.

At the time of Perkins' armed habitual criminal conviction, he had prior UUWF and AUUW convictions. Because those convictions had not been vacated at the time Perkins possessed a firearm \*\*\*, they could properly serve as the predicates for his armed habitual criminal conviction." *Perkins*, 2016 IL App (1st) 150889, ¶¶ 9-10.

¶ 54 It is undisputed that, at the time of the defendant's AHC conviction, he had two prior convictions for qualifying predicate offenses. As those convictions had not been vacated at the time of the defendant's November 2011 arrest, they could properly serve as predicate convictions for his AHC conviction. See, *e.g.*, *McFadden.* We conclude, therefore, that the defendant's AHC conviction could be based, in part, on a prior AUUW conviction stemming from the statutory provision held unconstitutional in *Aguilar*.

¶ 55 As we have reversed the first degree murder conviction due to insufficient evidence, we need not reach the merits of defendant's contention that the court erred in adding a 20-year firearm enhancement to that conviction. We remand for the trial court to resentence defendant on the AHC conviction only.

¶ 56                                                    CONCLUSION

¶ 57 For the foregoing reasons, we reverse the first degree murder conviction, affirm the AHC conviction, and remand for resentencing on the AHC conviction.

¶ 58 Affirmed in part and reversed in part.

¶ 59 Remanded for resentencing.